IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CYNTHIA KUTNYAK, ) | Case No. 1:22-cv-970 |
| ) | |
| Plaintiff, ) | JUDGE JOHN R. ADAMS |
| ) | |
| v. ) | MAGISTRATE JUDGE |
| ) | THOMAS M. PARKER |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |

Plaintiff, Cynthia Kutnyak, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. Kutnyak challenges the Administrative Law Judge's ("ALJ") non-disability finding, claiming that the ALJ misevaluated her subjective symptom complaints regarding her back pain. Because the ALJ failed to apply proper legal standards by failing to adequately articulate on what basis the ALJ found Kutnyak's subjective symptom complaints inconsistent with the medical record, I recommend that the Commissioner's final decision denying Kutnyak's application for DIB be vacated and that Kutnyak's case be remanded for further consideration.

**I.     Procedural History**

Kutnyak applied for DIB on June 1, 2020. (Tr. 204).[1] Kutnyak alleged that she became disabled on December 20, 2012, due to: (i) herniated disc with radiation; (ii) piriformis-related

---

[1] The administrative transcript appears in ECF Doc. 6.

sciatic pain; (iii) depression; (iv) anxiety; (v) headaches; and (vi) insomnia. (Tr. 204, 236). The Social Security Administration denied Kutnyak's application initially and upon reconsideration. (Tr. 107–14, 117–24). Kutnyak requested an administrative hearing. (Tr. 146).

On February 24, 2021, ALJ Pamela E. Loesel heard Kutnyak's case telephonically and denied Kutnyak's application in an April 6, 2021 decision. (Tr. 15–27, 34–58). In doing so, the ALJ determined at Step Four of the sequential evaluation process that Kutnyak had the residual functional capacity ("RFC") to perform work at the light exertion level, except:

> [Kutnyak] is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. She is able to stand and walk 6 hours of an 8-hour workday. She is able to sit for 6 hours of an 8-hour workday. She can push and pull within the lifting and carrying limitations. She can occasionally climb ramps and stairs. She can never climb ladders, ropes or scaffolds. She can occasionally stoop, crouch and crawl. She can never kneel. She must avoid all exposure to hazards – unprotected eights and heavy machinery. She can perform simple routine tasks (unskilled work) with no fast pace demand. She can have occasional superficial interactions (meaning for a short duration for a specific purpose) with co-workers, supervisors and the general public. She can tolerate infrequent change where changes are explained in advance and gradually implemented.

(Tr. 20). On April 28, 2022, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 6–8). On June 7, 2022, Kutnyak filed a complaint to obtain judicial review. ECF Doc. 1.

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Kutnyak was born on February 22, 1980. (Tr. 204). She was 32 years old on the alleged onset date and 37 years old on the date last insured – December 31, 2017. (Tr. 17). Kutnyak had two years of college education and specialized training as a state tested nursing assistant and medical assistant. (Tr. 43, 46, 70, 237). Her past relevant work included nursing assistant from 2002 to 2012 and dental assistant from 2005 to 2008. (Tr. 237). However, the ALJ determined that Kutnyak was no longer able to perform these jobs. (Tr. 25–26).

B.     Relevant Medical Evidence

Kutnyak contests only the adequacy of the ALJ's consideration of the subjective symptom complaints related to her physical impairments; thus, it is unnecessary to summarize the medical and non-medical evidence related to her other impairments.  *See generally* ECF Doc. 8.

On September 22, 2011, Kutnyak suffered an injury while working as a nursing assistant. (Tr. 460).  Kutnyak was assisting a patient go to the restroom when the patient's legs gave out. (Tr. 70, 382, 394, 449, 454, 460).  Kutnyak caught the patient and twisted herself to maneuver the patient onto the toilet.  (Tr. 460).  Kutnyak thereafter experienced back pain with left paraspinal and leg pain with numbness.  (Tr. 330, 382, 394, 460).

Sometime in 2012, Kutnyak initiated chiropractic and physical therapy treatment with Northwest Orthopaedics & Sports Medicine ("Northwest").  *See* (Tr. 327, 460).  Between January and May 2013, Kutnyak reported constant "moderate" (3-5/10) to "severe" (8-9/10) low back pain.  (Tr. 322, 324–27, 332, 344, 346).  Kutnyak's physical examination results were remarkable for: (i) "severe" (4-5/5) discomfort to palpation; (ii) reduced lumbar flexion, extension, and lateral flex; and (iii) positive Bechterew's, Kemp's, and left straight leg raise tests.  (Tr. 323, 325, 333, 335, 345).

On May 9, 2013, Kutnyak underwent an MRI examination of the lumbar spine due to a lack of symptom improvement.  (Tr. 330–31).  The results of MRI testing showed "[p]osterior central disc herniation at L4 and L5 levels with mild left L5 foraminal stenosis."  (Tr. 330). Kutnyak's treating chiropractor referred Kutnyak for an orthopedic consultation.  (Tr. 331).

Between May and October 2013, Kutnyak continued to receive treatment at Northwest. Kutnyak reported during that period moderate to severe low back pain and left leg pain.  (Tr. 336, 338, 340, 342, 348–49, 351, 353, 356, 360, 364–65).  Her physical examination results were

3

largely the same, except that she also had diminished hip flexion (4/5). (Tr. 337, 339, 341, 350, 370). By October 15, 2013, Kutnyak displayed reduced low back pain (7/10) and no lower extremity symptoms. (Tr. 368); *see also* (Tr. 351, 353, 356, 360, 364–65).

On November 14, 2013, Kutnyak visited Erin Anderson, PA-C, for an orthopedic consultation. (Tr. 368, 382). Kutnyak reported back pain with radiation to her posterior left leg and occasional numbness. (Tr. 382). Her physical examination results were unremarkable. (Tr. 383). Dr. Anderson recommended steroid injections and referred Kutnyak to pain management, noting that Kutnyak could return if she got no relief from conservative treatment. (Tr. 383–84). Kutnyak thereafter reported "significant" relief from steroid injections, reducing her pain to 0-3/10 in severity. (Tr. 446).

On April 14, 2014, Kutnyak was referred to vocational rehabilitation services with the Ohio Bureau of Worker's Compensation ("BWC"). (Tr. 445). Kutnyak completed 12 weeks of work adjustment training and was released to "full time work hours with overall light [return to work] limitations (lifting up to 40[lbs])." (Tr. 446). Kutnyak also completed a 36-week training program for medical assistant certification, with an overall 4.0 GPA. *Id.* Kutnyak was discharged from vocational rehabilitation services on October 14, 2015 on the advice of her physician of record that she could not return to work, as her pain symptoms had returned and were not relieved with steroid injections. (Tr. 446–47). Kutnyak reported "very limited sitting, standing and walking tolerances as a result of the pain and the need to lie down to alleviate the discomfort." (Tr. 446).

On September 2, 2015, Kutnyak visited Sherif Salama, MD, for pain management services, reporting low back and left buttock pain rated at 5/10 in severity. (Tr. 477). Kutnyak's physical examination results were remarkable for: (i) mildly distressed appearance; (ii) absent left patellar reflex; (iii) inability to perform heel/toe walk; (iv) decreased lumbar range of

motion; (v) lumbar spine and paravertebral tenderness; and (vi) positive left straight leg raise test. (Tr. 479). Dr. Salama ordered another steroid injection and prescribed Zanaflex. *Id.*

On November 6, 2015, Kutnyak returned to Dr. Salama for a post-injection follow-up. (Tr. 472). She reported that her last injection provided "some relief" (50% improvement), with pain on some days but not others. *Id.* She reported her pain between 7 and 8/10 in severity, which reduced her tolerance for prolonged standing and sitting, walking normally, and bending. *Id.* Kutnyak's physical examination results were similar to those of her September 2, 2015 visit. *See* (Tr. 474). Dr. Salama authorized another steroid injection and prescribed tramadol. *Id.*

On April 15, 2016, Kutnyak visited Louis Keppler, MD, for a diagnostic lumbar discogram. (Tr. 440). The results of the examination showed "L5 diffuse degeneration and L4 degeneration with posterior extravasation." *Id.*

On May 2, 2016, Kutnyak reported to Dr. Keppler that her last steroid injection improved her leg pain but not her low back pain. (Tr. 438). She reported that her low back pain had reached the point at which it interfered with her activities of daily living; she wanted it "fixed." *Id.* Dr. Keppler recommended an anterior lumbar interbody fusion, which he performed on June 22, 2016. (Tr. 437–38).

Between July 2016 and July 2017, Kutnyak reported improvement in her post-surgical condition. In July 2016, she reported that, although she had intermittent pain, it was relieved with Norco. (Tr. 429). In October 2016, she reported that she was "doing better" than before the surgery but requested to be taken off Norco. (Tr. 436). In March 2017, she reported that she was "doing very well following surgery" and was taking Vicodin occasionally for pain, particularly on days when she did physical therapy. (Tr. 433). And in July 2017, Kutnyak reported that she felt "much better" and was "really happy with her results." (Tr. 431). Dr. Keppler stated that Kutnyak was doing "remarkable well" and, although he did not

recommend heavy lifting, he would "make a note relative to Cynthia as a potential MA employee." (Tr. 431, 433).

Meanwhile, Kutnyak reported to her mental health provider continued pain. Between September 2016 and July 2017, Kutnyak was noted to have "Moderate" limitations in her ability to concentrate, persist, and maintain pace because of her pain, as periods of "high pain" made it difficult to concentrate. (Tr. 404, 406, 408). She was also noted to have "Marked" limitations in her activities of daily living. *Id.*

On July 6, 2017, Kutnyak reported to her mental health provider pain rated at 5-8/10 in severity over the previous week. (Tr. 408). She reported that she could be "more active" when her pain was at 5/10 in severity but when her pain reached 8-9/10, she would be in bed most of the day. *Id.* Kutnyak also reported that she could sit for one to two hours before needing to lie down. *Id.* During a February 2018 follow-up, she reported pain rated at 7-8/10 in severity. (Tr. 410).

On July 30, 2018, Kutnyak returned to Dr. Keppler. (Tr. 430). She reported that she was "doing well" until June 2018, when she developed radiating right leg pain after arching her back during physical therapy. *Id.* She reported no relief with NSAIDS or muscle relaxers. *Id.* On physical examination, she had a positive straight leg raise test. *Id.*

  C. **Relevant Opinion Evidence**

    1. **Consultative Examiner – David A. Garcia, DO**

On January 13, 2014, David A. Garcia, DO, examined Kutnyak to determine the extent of her physical disability for BWC. (Tr. 449). Kutnyak reported low back pain and occasional left lower extremity pain rated at 7/10 in severity, which was exacerbated by lifting and prolonged standing and sitting. (Tr. 450). Her physical examination results were remarkable for: (i) slow gait; (ii) slight guarding movement; (iii) tenderness of the midline region; (iv) positive left

6

straight leg raise test; (v) reduced range of motion; (vi) +4/5 muscle strength with flexion and extension; and (vii) diminished left patellar reflex. *Id.*

Dr. Garcia opined that Kutnyak had not achieved maximum medical improvement[2] ("MMI") because there were still outstanding treatment modalities (steroid injections) available. (Tr. 450–51). Dr. Garcia further opined that Kutnyak could: (i) lift 10 pounds frequently and 20 pounds occasionally; (ii) sit continuously; (iii) frequently push, pull, stand, walk, and lift above her shoulders; (iv) occasionally bend, twist, turn, and reach below the knees; and (v) never squat or kneel. (Tr. 451, 453).

### 2. Consultative Examiner – Cynthia Taylor, DO

On January 13, 2016, Cynthia Taylor, DO, reexamined the extent of Kutnyak's physical disability for BWC. (Tr. 454). Kutnyak reported pain rated at 6/10 in severity and left leg numbness. *Id.* She further reported that she could not tolerate prolonged sitting, standing, bending, or lying down. *Id.* Her physical examination results were remarkable for: (i) inability to rise on her left heel and toes; (ii) tenderness of the lumbar spine with radiation into the buttock; (iii) decreased lumbar range of motion; (iv) decreased lower extremity reflex; and (v) positive left straight leg raise test. (Tr. 455).

Dr. Taylor opined that Kutnyak had achieved MMI, unless it was determined that surgery was necessary. *Id.* Dr. Taylor further opined that Kutnyak could: (i) occasionally lift up to 20 pounds; (ii) occasionally bend, push, pull, stand, walk, sit, and lift above her shoulders; and (iii) never twist, turn, reach below the knees, squat, and kneel. (Tr. 458).

---

[2] BWC defined maximum medical improvement as "a treatment plateau … at which no fundamental, functional or physiological change can be expected within reasonable medical probability in spite of continuing medical or rehabilitative procedures." (Tr. 450).

7

### 3. Consultative Examiner – Randy Plona, DO

On December 28, 2016, Randy Plona, DO, reexamined the extent of Kutnyak's physical disability for BWC. (Tr. 459). Kutnyak reported that, after her surgery, she rested for four months and completed aqua therapy, achieving "30% resolution of her lumbar pain." (Tr. 460). She rated her pain at 5-8/10 in severity, which she treated with methocarbamol, hydrocodone, and a TENS unit. *Id.* In discussing her activities of daily living, Kutnyak stated that: (i) she was unable to mow the lawn or carry a basket of clothes; (ii) it was hard for her to stand and fold clothes; (iii) she could stand for 30 minutes before needing to sit down because of her pain; and (iv) she occasionally walked her dog. (Tr. 461). Her physical examination results were remarkable for slow ambulation and reduced lumbar range of motion. *Id.*

Dr. Plona opined that Kutnyak had achieved MMI with respect to her lumbar sprain but not her disc herniation, because she was currently in post-surgical physical therapy. (Tr. 462). Dr. Plona recommended that Kutnyak refrain from all work until cleared by her surgeon. (Tr. 463, 465).

### 4. State Agency Consultants

On August 29, 2020, David Knierim, MD, evaluated Kutnyak's physical capacity based on a review of the medical evidence. (Tr. 110–12). Dr. Knierim found that Kutnyak could: (i) lift 10 pounds frequently and 20 pounds occasionally; (ii) sit, stand, and walk for 6 hours in an 8-hour workday; (iii) frequently stoop, kneel, crouch, and crawl; (iv) never climb ladders, ropes, and scaffolds; and (v) never be exposed to hazards. (Tr. 110–11). On October 19, 2020, James Cacchillo, MD, concurred with Dr. Knierim's assessment. (Tr. 120–21).

### D. Relevant Testimonial Evidence

Kutnyak testified at the ALJ hearing that she lived with her retired mother and son, who did most of the housework. (Tr. 40). Kutnyak testified that her son also assisted with bathing

and dressing because of her difficulty with prolonged standing and inability to bend beyond a certain point. (Tr. 40, 42). She testified that she could sit and help fold clothes. (Tr. 42). And though she could drive, she testified that she only did so if absolutely necessary. (Tr. 40–41).

Kutnyak testified that she did "a little bit better" after her surgery, but her pain came back as she did physical therapy. (Tr. 47). She testified that she was treating her pain with tizanidine, home stretches, aqua therapy, and acupuncture. (Tr. 48). She testified that her pain also made it difficult to concentrate. (Tr. 50–51). And although she could sit in her own purpose-built chair, she testified that other chairs caused back pain. (Tr. 49–50).

Vocational Expert Kevin Yi testified that someone with the ALJ's hypothetical limitations could perform work at the light exertion level as a mailroom clerk, electronic worker, and merchandise marker. (Tr. 54–54). If the individual would be off task 20% of the time or miss work more than twice per month, the VE testified the individual would be precluded from competitive employment. (Tr. 55–56).

### III. Law & Analysis

#### A. Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *Id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009). Nor will the court

uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B. Step Four: Subjective Symptom Complaints

Kutnyak argues that the ALJ failed to apply proper legal standards when the ALJ gave only a boilerplate finding that her subjective symptom complaints (that her impairments prevented her from standing and walking at the light exertion level) were inconsistent with the medical record, without clearly articulating reasons to support that conclusion. ECF Doc. 8 at 14–19. Kutnyak argues that the ALJ also did not indicate how she considered the regulatory factors that must be used to evaluate subjective symptom complaints. ECF Doc. 8 at 17–19. And Kutnyak argues that the ALJ failed to discuss Dr. Garcia's corroborative findings and "properly consider" Dr. Taylor's findings. ECF Doc. 8 at 15–16.

The Commissioner responds that the ALJ did not err by using boilerplate language, because the ALJ identified substantial evidence to support her RFC findings. ECF Doc. 9 at 17–19. The Commissioner argues that the ALJ did consider Dr. Garcia's and Dr. Taylor's findings, the evaluation of which Kutnyak has not otherwise challenged. ECF Doc. 9 at 19–20. And the Commissioner argues that the ALJ was not required to explain how she considered each regulatory factor. ECF Doc. 9 at 20.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence in the record. 20 C.F.R. § 404.1520(e). This includes a claimant's subjective symptom complaints, which can serve as a basis for disability if there is objective medical which confirms the alleged severity of the symptoms. 20 C.F.R. § 404.1529(a); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom

10

complaints and may properly discount them if they are inconsistent with the medical and other evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016). If the ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); SSR 16-3p, 2016 SSR LEXIS 4, at *26. However, the ALJ need not explicitly discuss each regulatory factor or incorporate all the information upon which she relied into a single tidy paragraph. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012); *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010).

    The ALJ failed to apply proper legal standards in her evaluation of Kutnyak's subjective symptom complaints. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ did comply with the regulations to the extent that she: (i) assessed Kutnyak's RFC in light of the medical evidence, her testimony, and other evidence in the record; and (ii) clearly explained that she rejected Kutnyak's subjective symptom complaints because the objective evidence did not support the alleged severity, chronicity, and frequency of her symptoms. 20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *3-4, 11-12, 15; SSR 96-8p, 1996 SSR LEXIS 5, at *13–15 (July 2, 1996); (Tr. 20–25). Contrary to Kutnyak's argument, the ALJ did not have to articulate how she considered each of the regulatory factors. *Renstrom*, 680 F.3d at 1067 ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (Internal quotation marks omitted)). And a review of the ALJ's decision confirms

11

that the ALJ did consider Dr. Garcia's and Dr. Taylor's findings.[3] (Tr. 23–24 (citing Tr. 449, 453–54, 458)).

Where the ALJ ran afoul of the regulations, however, was in her articulation of reasons supporting her conclusion that Kutnyak's subjective symptom complaints were inconsistent with the record:

> [Kutnyak's] allegations are partially consistent with respect to the nature of her symptoms. However, her allegations that her symptoms are so severe that she cannot perform work at substantial gainful activity levels are not consistent in light of the evidence of record [sic] symptom exaggeration, inconsistent statements and activities consistent with the ability to perform a range of light work. [Kutnyak] alleges disability due to L4, L5, S1 herniated disc with radiation, paraformas [sic] muscle causing sciatic pain, headaches, insomnia, depression, and anxiety. Although the undersigned found [Kutnyak] to have severe impairments, they are not work preclusive. Treatment notes in the record do not sustain [Kutnyak's] allegations of disabling pain. While those records do indicate that the claimant is suffering from several impairments that were previously detailed in this decision, they fail to include any limitations that would affect [Kutnyak's] functional capacity to such an extent that it would support a finding of functional limitations that exceed those assessed within this decision. In addition, the medical records weaken the consistency of [Kutnyak's] allegations because they fail to show that [her] alleged impairments rise to a level sufficient to support a finding that [she] is disabled. While[ Kutnyak] does experience some level of limitations, the impact is only to the extent described in the residual functional capacity above. There is no evidence that [Kutnyak's] use of prescribed medication is accompanied by side effects that would interfere significantly with her ability to perform work within the restrictions outlined in this decision. No treating source refers to [Kutnyak] as having incapacitating or debilitating symptoms that would prevent her from returning to the workplace at a reduced level of exertion such as in the performance of light work. In summary, the evidence does not corroborate [Kutnyak's] allegations of symptoms attributed to her impairments to an extent that would preclude the performance of light work with the restrictions stated above.

(Tr. 25). Although lengthy, this paragraph consists almost entirely of different variations of the same conclusory sentence: that the severity of Kutnyak's claimed symptoms was not fully

---

[3] If Kutnyak meant to argue that the ALJ's analysis of the opinion evidence failed to comply with the regulations governing the consideration of *opinion* evidence, I find the issue forfeited. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

corroborated by the medical record. *See* (Tr. 25). What's missing is an articulation of how the ALJ reached that conclusion, so that we can, in turn, assess whether substantial evidence supports the ALJs finding on Kutnyak's subjective symptom complaints. SSR 16-3p, 2016 SSR LEXIS 4, at *26. The ALJ did not specify any single medical record that showed Kutnyak had functional capabilities beyond what she claimed an inability to do because of her symptoms. Moreover, the ALJ's alarming conclusion that the medical records demonstrated Kutnyak had exaggerated her symptoms is completely devoid of support in the ALJ's decision.

Of course, the ALJ was not required to confine her reasons into a single, tidy paragraph. *Buckhannon ex. rel. J.H.*, 368 F. App'x at 678–79. But even reading the ALJ's decision as a whole and with commonsense, an articulation problem remains. Important to remember is that Kutnyak had to establish disability on or before December 31, 2017. *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). The evidence around that time painted two different pictures of Kutnyak's condition. Dr. Keppler's treatment notes reflected that Kutnyak's condition continually improved post-surgery to the point that she was "really happy with her results" and that she continued "doing well" through June 2018 – after the date last insured. (Tr. 22); *see* (Tr. 429, 430–31, 433, 436). By contrast, Kutnyak reported to Dr. Plona and her mental health provider that she still experienced pain between 5 and 8/10 in severity and was limited in her activities to daily living. (Tr. 23–24); *see* (Tr. 404, 406, 408, 459–61). Although the ALJ's decision could be read as implicitly giving more weight to Dr. Keppler's treatment notes than Kutnyak's subjective reports to Dr. Plona and Kutnyak's mental health provider, the ALJ failed to articulate reasons to support that *implied* conclusion so that we could review that finding. *Fleischer*, 774 F. Supp.2d at 877; SSR 16-3p, 2016 SSR LEXIS 4 at *26.

The ALJ's articulation error cannot be overlooked as harmless. Without additional explanation, we cannot review the ALJ's evaluation of Kutnyak's subjective symptom

13

complaints that: (i) she could not tolerate standing for more than 30 minutes before needing to sit (Tr. 461); (ii) she could not tolerate sitting for 2 hours before needing to lie down (Tr. 408); (iii) other than folding clothes in a seated position, she could not perform household tasks or dress and groom independently (Tr. 40, 42, 461); (iv) that her condition was so advanced that she was actually forced to enlist her *son's* assistance in bathing and dressing[4] (Tr. 40); and (v) periods of pain rated at 8-9/10 in severity rendered her bedridden (Tr. 408). *Fleischer*, 774 F. Supp.2d at 877. This is particularly so considering that the VE testified that 20% off-task behavior or more than two absences per month would be work preclusive. (Tr. 55–56).

Although it is possible that substantial evidence *might* exist that would support the ALJ's conclusion regarding Kutnyak's subjective symptom complaints, we cannot reach that conclusion from the limited information the ALJ included in her decision. Put simply, the ALJ's analysis failed to build an accurate and logical bridge between the evidence and the result. *Fleischer*, 774 F. Supp.2d at 877; SSR 16-3p, 2016 SSR LEXIS 4 at *26. A remand is thus warranted for the ALJ to reevaluate Kutnyak's subjective symptom complaints and articulate her findings sufficiently for this court to be able to track the basis for her conclusions.

**IV.    Recommendation**

Because the ALJ failed to apply proper legal standards in her evaluation of Kutnyak's subjective symptom complaints, I recommend that the Commissioner's final decision denying Kutnyak's application for DIB be vacated and that Kutnyak's case be remanded for further consideration.

Dated: February 16, 2023

Thomas M. Parker
United States Magistrate Judge

---

[4] Although our function is not to independently evaluate the evidence, it strains credulity to think a mother would enlist her own son in bathing and dressing activities simply to obtain undeserved disability benefits.

_____

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, \*6 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).